LONG DOCK COMPANY, PROSECUTOR, v. STATE BOARD OF ASSESSORS ET AL.

MORRIS AND ESSEX RAILROAD COMPANY, PROSECUTOR, v. STATE BOARD OF ASSESSORS ET AL.

CENTRAL RAILROAD OF NEW JERSEY, PROSECUTOR, v. STATE BOARD OF ASSESSORS ET AL.

Argued February 25, 1909—Decided June 7, 1909.

1. In the ascertainment of the value of second-class railroad property under subdivision 2 of section 3 of the revised act of 1888 for the taxation of railroad and canal property, the state board of assessors is required to value such property at the value it has in exchange for money as shown by the testimony, *i. e.*, at its market value. Additional value imparted to such property by its use under a railroad franchise should not be included in such ascertainment.

2. The duty of the state board of assessors under the supplemental act of March 4th, 1908, is the same, and none other than that required of them by section 3 of the revised act of 1888 recited in such supplement.

---

On *certiorari*.

These writs of *certiorari* bring up for review the action of the state board of assessors in placing a valuation upon the terminal lands of the prosecutors in Jersey City and Hoboken under the supplement to the act for the taxation of railroad and canal property, approved March 4th, 1908. *Pamph L., p.* 15.

There is one question that is raised by the reasons filed in each case the precise nature of which will be made to appear by a brief recital of antecedent legislation and adjudication.

In 1884 the original statute for the taxation of railroad and canal property was enacted by the provisions of which all the property of these corporations was to be assessed for taxation, property not used for railroad purposes being made assessable by local assessors and all property that was so used being made assessable by a state board of assessors who were required in acertaining the true value of such property to ascertain the value—*first,* of the main stem; *second,* of other real estate used for railroad purposes (called second-class railroad property) ; *third,* of tangible personal property, and *fourth,* of the franchise. The revision of this act in 1888 did not vary these requirements.

The duty thus imposed was performed by the state board of assessors uninterruptedly from 1884 to 1905, when by the provisions of the so-called "Perkins act" (*Pamph. L.* 1906, *p.* 571) such duty as to second-class railroad property was transferred to the local municipal assessors, who made such assessments for the years 1906 and 1907.

On March 3d, 1908, the "Perkins act" was declared to be unconstitutional (*Central Railroad Co.* v. *State Board of Assessors,* 46 *Vroom* 771), and on the following day the legislature passed the remedial act under which the valuations and assessments now before us were made by the state board of assessors. This supplement, after reciting the foregoing facts and the further fact that the time within which the state board of assessors might make a proper assessment had by reason of the premises expired, enacted that the time for the performance by the state board of assessors of their duty under the revised act of 1888 with respect to the valuation and as-

sessment of second-class railroad property for the years 1906 and 1907 be extended, and that within such extended time such duty should be performed.

In their performance of this duty which, saving as to time, was precisely the original and normal duty imposed on such board by the revised act of 1888, the state board of assessors placed upon the terminal lands of the respective prosecutors the valuations shown by the returns to these several writs of *certiorari.* These valuations are now attacked by each of the prosecutors upon the ground that as part of the taxing scheme in question they are in excess of the true value of said lands. The returns to these writs bring up the preliminary assessments and the objections thereto filed with the state board of assessors, together with the exceptions to the final determination of the board. Upon the questions of fact a voluminous mass of testimony taken before the state board is returned upon the weight of which as well as upon the legal questions involved counsel representing the prosecutors and the two taxing districts affected have presented comprehensive arguments both orally and by briefs prepared both before and after the oral argument.

Before Justices GARRISON, BERGEN and VOORHEES.

For the Long Dock Company, *William H. Corbin.*

For the Morris and Essex Railroad Company, *William D. Edwards.*

For the Central Railroad Company, *George Holmes* and *Richard V. Lindabury.*

For Jersey City, *Warren Dixon.*

For the city of Hoboken, *Horace L. Allen.*

The opinion of the court was delivered by

GARRISON, J. From the testimony brought up by these writs we find two facts touching the valuation placed by the

state board of assessors upon the terminal lands of the respective prosecutors to review which these suits have been brought—*first,* that as to the lands of each of the prosecutors such valuation is in excess of the value such lands have in exchange for money, *i. e.,* their market value; *second,* that the valuation of such lands by the state board of assessors, in so far as it is in excess of their market value, is based upon and represents the value imparted to such lands by their actual use for railroad purposes under the franchises of the respective corporations so using them.

In view of these findings of fact the pertinent legal questions are—*first,* what is the nature of the duty imposed upon the state board of assessors by the supplemental act of March 4th, 1908? (*Pamph. L., p.* 15), and *second,* in the performance of the duty imposed by that supplement, is the state board of assessors to value second-class railroad property at its market, *i. e.,* its money exchange value, or are they to include in such valuation the additional value that is imparted to such property by reason of its use under the franchise of the company so using it?

The first of these questions is answered by the act itself, viz., that the duty it requires of the state board of assessors is that required by the provisions of subdivison 2 of section 3 of the revised act of 1888. There is no suggestion in the supplemental act that the state board is to perform any other or different duties under the recited section of the revised act than such board would have performed in due course if the Perkins act had never been passed. The sole question, therefore, is whether or not in the valuation of second-class railroad property under subdivision 2 of section 3 of the act of 1888 the state board of assessors is to include in and enhance such valuation by an additional value that is imparted to such property by the circumstance that it is used under a railroad franchise.

We think that the increase of value over and above its market value that is imparted to second-class railroad property by reason of its use under a railroad franchise should not be included in the valuation of such property by the state

board of assessors under section 3 of subdivision 2 of the act of 1888, and that the opposite course would be directly contrary to the scheme of such act; in other words, that it is absolutely essential to the integrity of the taxing scheme of this act that the valuation placed upon tangible real property under subdivision 2 of section 3 of the act shall not include any element of value that is imparted to it by the intangible property, *i. e.*, the franchise, that is to be valued under subdivision 4 of the same section.    The reason for this is, we think, clear.

It is matter of political history that the paramount object sought to be attained by the act of 1884 for the taxation of railroad and canal property was the taxation of the franchises of these corporations, and it is apparent from an examination of the provisions of the act that its predominating purpose in such taxation was that the money derived from that particular source, *i. e.*, the taxation of railroad and canal franchises, should go to the state for state purposes whatever disposition might be made of the money derived under the act from the taxation of the tangible real property of these corporations situated in the various taxing districts.

To meet these requirements the act of 1884 imposed upon property used for railroad and canal purposes a single tax, in the distribution or apportionment of which as between the state and the taxing districts so much of the entire tax as represented the value of the franchise (and certain of the tangible property) was to go to the state by which such franchise had been granted and so much as was based upon the real property situate in the taxing districts was to go to those districts by which but for this act such property would have been taxed.    This scheme taxed the value of the franchise for the sole benefit of the state.

Such being the scheme and the equity of the act, it was imperatively requisite not only that the franchise should be assessed and taxed at its true value, but also that the tax yielded by it should go to the state and not to the taxing districts.

These being the paramount purposes of the act, the problem was how to assess and tax this intangible property so as to

secure these results and at the same time to comply with the constitutional requirement that property shall be assessed for taxes by uniform rules according to its true value.

The elements that entered into this problem were deemed by the legislature and subsequently by the court of last resort to be sufficiently marked and characteristic to form the basis of a general law for the assessment and taxation of the property of railroads and canals, chief among which was the circumstance that the franchise value, which it was the paramount object of the act to reach, was in the nature of things distributed over the entire property, real and personal, that was used under it, imparting some modicum of such value to every item thereof wherever situated and however used in furtherance of the object for which such franchise was granted. The practical impossibility of the apportionment by any uniform rule of this unique value among the hundreds of thousands of items of property of these companies by the assignment by the local assessors to each item of the increment in value specially imparted to it was the effective characteristic laid hold of by the legislature upon which to rest a comprehensive and constitutional scheme for the assessment and taxation of all of the property of these corporations including their franchises. In general terms the basis of the classification adopted was "property used for railroad and canal purposes," but a moment's reflection will suffice to show that the only feature of such use that was strictly germane to the legislative object in question, viz., the valuation of such property for the purpose of its taxation was the value imparted to such property by such use, and inasmuch as such use was solely by virtue of a franchise so to use, the expression "property used for railroad and canal purposes" is upon the question of its valuation under the act the precise equivalent of "property to which a value is imparted by its use under a railroad or canal franchise." This equivalence, though not expressly pointed out when the only matter *sub judice* was the constitutionality of the act as a whole, should be recognized whenever in the practical administration of the act we are required to determine the internal relations of the several

parts of the act to each other and to the entire working scheme of the act itself. Upon the question now before us touching the inclusion of franchise value in the valuation of second-class railroad property (which has not hitherto been susceptible of presentation in this isolated form) the recognition of this essential element of the classification upon which the act itself is based is of vital importance, for otherwise it might be deemed that the state board of assessors in the administration of the act were required to do the very thing upon the impracticability of doing which the entire act itself was based, viz., to assess a franchise value directly upon tangible railroad and canal property. The act, however, contains no such self-stultification, for by section 3 the state board is definitely required to ascertain the value of the franchise in a subdivision by itself. Under subdivisions 1, 2 and 3 of section 3 the board is to ascertain the value of the tangible property, and under subdivision 4 the value of the franchise. The revision of 1888 while not varying this requirement altered the language of subdivision 4 in a respect that must challenge attention occurring as it does in a revision that was so extremely chary of making changes. In the original act subdivision 4 read, "The value of the franchise;" this was changed in the revision of 1888 to, "The value of the remaining property including the franchise." The significance of this change is not so much in its intimation that there may be intangible property of a corporation other than its franchise as in its suggestion that such intangible property is "remaining property," *i. e.,* property that is left after something has been taken or subtracted from something else. This remainder being the value of the intangible property of a corporation, which together with the value of its tangible property makes up the total value of its corporate wealth, it is obvious that the subtrahend or sum to be subtracted is the value of such tangible property (ascertained under subdivisions 1, 2 and 3), and that the minuend or sum from which such subtraction is to be made is the total value of such corporate property determined in accordance with the detailed provisions of sections 16, 17 and 18 of the act. Unless this

is the purpose of these sections it is impossible to see what they are doing in a statute so scientifically drawn as this one is.

If such be the purpose of these sections the remainder obtained by the deduction of the value of the tangible property from the total value of all the corporate property gives the commercial value of the franchise expressed in the terms of money in strict compliance with the carefully revised phraseology of subdivision 4, viz., as "the remaining property," and thus also an intangible value is translated into the terms of the commercial standard just as in the physical sciences the specific gravity of a ponderable substance is translated into the terms of the common physical standard.

The matter is not, however, for present purposes of controlling import, since by whatever method the total value of the enfranchised property be determined the result is the same upon the only consideration with which we are concerned, viz., that the value of the franchise must be truly and separately ascertained and that once having been ascertained no remnant of such value inheres in the tangible property of the company to enhance its valuation by reference to its use under such franchise.

That these considerations are vital in the administration of the act is manifest from the circumstance that the tax imposed by it is a single tax (*Central Railroad Co.* v. *State Board of Assessors,* 46 *Vroom* 771) into which it was intended that the element of franchise value should enter but once. The scheme of the act is that upon the total valuation of a company's property into which necessarily the full value of its franchise enters a tax rate shall be laid for the sole benefit of the state, and that upon second-class property another rate shall be laid for the sole benefit of the taxing districts, and that these two combined rates shall constitute the single tax levied under the act. Inasmuch, however, as into this single tax the element of franchise value is to enter but once, and then solely for the benefit of the state, it is perfectly obvious that if any element of such franchise value is included in the valuation of second-class property the scheme of the act

is frustrated and a double taxation imposed that is without the slightest justification in the act. Hence we are forced to the conclusion that in the ascertainment of the value of second-class railroad property under subdivision 2 of section 3 of the act of 1888, which is the sole matter *sub judice,* no element of value imparted to such property by its franchise use should be included.

The same conclusion is forced upon us in a different way when we consider the specific duty required of the state board of assessors by section 3 of the act. Under this section a valuation is to be placed upon all tangible property and then the value of "the remaining property," to wit, the intangible, is to be ascertained. Inasmuch, therefore, as the value of such intangible property is required to be assembled and ascertained as a totality under the last-mentioned head, it is clear that no element of such value was intended to be computed under any other head. All franchise value, *i. e.,* all value imparted to corporate property by its franchise use is to be gathered up under one head as the value of "the remaining property," *i. e.,* the property remaining after all tangible values have been deducted. The plain purpose was, to use a homely metaphor, that the franchise value should be "skimmed off" for the use of the state and this of necessity implies that no element of such value shall be confused with the value of second-class property and thus go to the uses of the taxing districts. If this be not the proper construction of section 3, *i. e.,* if the value of the tangible property mentioned in the first three subdivisions of that section was intended to be ascertained at the enhanced value imparted to it by its franchise use, then we have the absurd result that upon the deduction of the aggregate valuation of the tangible property thus ascertained from the total value of the company's property in order to ascertain the value of "the remaining property," the value of such remaining property, including the franchise, would, in view of the axiom that the whole is equal to the sum of its parts, be always found to be exactly and precisely nothing at all. Thus we are again forced to the conclusion already expressed, viz., that in the ascertainment of the value

of second-class railroad property under subdivision 2 of section 3 of the act of 1888 the state board of assessors should value such property at the value it has in exchange for money without regard to any enhanced value such property may have imparted to it by its use under the franchise of the company so using it. To the argument that such valuation is not the true value of such property the complete answer is that the assessment upon which the entire tax is based complies in all respects with the constitutional requirement and that the subsidiary ascertainment of value incidental to the apportionment of such single tax does not come within the purview of the organic law.

We are not intending to suggest that the availability of land for railroad purposes generally may not be shown and taken into account in the ascertainment of its market value. The reasoning of the opinion in *Currie* v. *Waverly Railroad Co.,* 23 *Vroom* 381, although there applied to the condemnation of land, is equally pertinent to the question of its market value. The difference, however, between the market value of land by reason of its availability for railroad purposes generally, and the value imparted to such land by its specific use under a railroad franchise, is so great as to be fundamental. The latter value is special and peculiar to the individual user of the land proceeding as it were from within, whereas the former is general and is based upon external conditions susceptible of universal application as a legal measure. A single foot of submarine cable, owing to its peculiar use under the franchise of its operating company, has thereby imparted to it a value many thousand times greater than such foot of cable possesses when estimated at its market value. The same is true of the tracks of a railroad company and is also true of its terminal lands. Our General Tax act (*Pamph. L.* 1903, *p.* 398) practically defines the market value of land as "the price it would sell for at a fair and *bona fide* sale by private contract." In the valuation of the terminal lands of the prosecutors it was the duty of the state board under the act of 1888 to appraise them at their market value from the testimony.

This being the duty of the state assessors under the section of the revised act recited in the supplemental act of 1908, such and none other was their duty under such supplemental act. This duty we have by the first of our findings of fact decided that the state board did not perform in that they valued the terminal lands of each of the prosecutors in excess of the money exchange value possessed by such lands as shown by the testimony. This is conclusive of the case without regard to the second of our findings of fact which serves only to point out the erroneous principle that entered into and produced such overvaluation. In view of this result certain subsidiary questions affecting some only of the prosecutors have not been considered.

In order that the state board of assessors may perform the duty imposed upon them by the supplement of 1908 in conformity with the views herein expressed, the valuations, assessments and taxes brought up by these writs of *certiorari* are set aside. A rule to that effect may be entered by each of the prosecutors.